IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LINDA ECKERT BALLARD,

        Plaintiff,

vs.                                 CIVIL NO.  10-886 JH/LFG

THE GEO GROUP, INC., MIKE
MARTIN, NFN GRAYSON, and
DEBRA VEGA-COWAN,

        Defendants.

## REPORT AND RECOMMENDATION[1]

THIS MATTER is before the Court on an Order of Reference, filed May 14, 2013 [Doc. 197].  The trial judge, the Honorable Judith C. Herrera, requested that the undersigned Magistrate Judge issue a report and recommendation on Defendants' "Amended Joint Motion for Summary Judgment" ("amended motion").  [Doc. 156.]

### Summary of Amended Complaint

*Pro Se* Plaintiff Linda Eckert Ballard's ("Ballard") Amended Complaint against Defendants primarily alleges civil rights violations. [Doc. 10.] The Amended Complaint sets out the following claims:  (1) Gross Negligence against all Defendants [Doc. 10, at 10-12]; (2) Failure to Train against

---

[1]Within fourteen (14) days after a party is served with a copy of this analysis and recommended disposition, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendation.  A party must file any objections within the fourteen-day period allowed if that party wants to have appellate review of the analysis and recommendation.  If no objections are filed, no appellate review will be allowed.  *See, e.g.*, Wirsching v. Colorado, 360 F.3d 1191, 1197 (10th Cir. 2004) ("firm waiver" rule followed in Tenth Circuit holds that a party who fails to object to magistrate judge's findings and recommendations in timely manner waives appellate review of both factual and legal questions).

Defendants The GEO Group, Inc. ("GEO"), and Warden Mike Martin ("Martin") [Doc. 10, at 12-13]; (3) Violation to Right of Privacy against Defendant Debra Vega-Cowan ("Vega-Cowan") [Doc. 10, at 13-14]; (4) Failure to Accommodate Known Disability against all Defendants [Doc. 10, at 14-17]; (5) False Imprisonment against "all those who participated, known or unknown" [Doc. 10, at 17-18]; (6) Cruel and Unusual Punishment against "all those who participated, known and unknown" [Doc. 10, at 18-19]; (7) "Intentional Malicious Infliction of Physical and Mental Duress" against "all those who participated, known and unknown" [Doc. 10, at 19-20]; and (8) Den[ial of] Right to Practice Religious Freedom against Defendants GEO, Martin and Lieutenant Grayson ("Grayson") [Doc. 10, at 20-21.] Some of the claims overlap with others; some claims are not entirely clear.

Ballard seeks declaratory relief "in the form of exact guidelines which must be followed in each case when allegations of mental illness are involved" and "to keep The GEO Group, Inc. and any of their employees, past and in the future from molesting [] Plaintiff now and in the future." [Doc. 10, at 21, 22.] She further requests awards of punitive damages, "actual damages, consequential damages, and compensatory damages." [Doc. 10, at 22.]

In the Amended Complaint, Ballard noted that she filed another case in federal district court, No. CIV 10-1161 JAP/LFG, that was related to this case, and arose out of the same underlying arrest. [Doc. 10, ¶ 71.] On January 31, 2011, the District Court dismissed that case without prejudice under § 1915(e)(2)(B)(ii). [Doc. 5 in No. CIV 10-1161.]

In Defendants' Answer to the Amended Complaint, they generally denied Ballard's allegations and raised a number of affirmative defenses. [Doc. 19.] After discovery was completed, Defendants filed the present amended summary judgment motion.

**Procedural History**

Defendants' amended motion was served on January 24, 2013.  Ballard's response was due no later than February 11, 2013.  *See* D.N.M.LR-Civ 7.4(a) (setting out deadlines for responses). She failed to respond within the time provided by law.  On February 25, 2013, Defendants filed a Notice of Completion of Briefing.  [Doc. 168]. Their Notice states that briefing consisted only of their Amended Joint Motion for Summary Judgment filed on January 24, 2013.  On March 13, 2013, Defendants filed an Amended Notice of Completion of Briefing [Doc. 172], stating that briefing consisted of their Amended Joint Motion for Summary Judgment and their Reply [Doc. 171].

Subsequent to the Notice of Completion of Briefing and without seeking leave of Court for filing an out-of-time response, Ballard ultimately filed a Response on March 4, 2013. [Doc. 169.] Defendants thereafter filed a Reply [Doc. 171], and Ballard filed a Motion for Leave to File Surreply [Doc. 180].  The Court disregarded Ballard's untimely response [Doc. 199], and denied her motion to file a surreply [Doc. 202].  Thus, there was no need to consider Defendants' reply in evaluating the amended summary judgment motion.

This district's local rules provide that the failure to respond to a motion constitutes consent to grant the motion.  D.N.M.LR-Civ. 7.1(b).  However, our circuit court indicated that it is improper to grant a motion for summary judgment simply because a party fails to respond.  *See* Murray v. City of Tahlequah, 312 F.3d 1196, 1200 (10th Cir. 2002) (holding that "[i]f the nonmoving party fails to respond, the district court may not grant the [summary judgment] motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law").  Dismissal, under those circumstances, would serve as a sanction, and sanctions should only

be entered after consideration of the requirements of <u>Ehrenhaus v. Reynolds</u>, 965 F.2d 916, 920 (10th Cir. 1992).

Therefore, even though the local rule contemplates consent due to a failure to respond, the Court declines to grant the motion for that reason.  Instead, it will consider Defendants' amended motion on the merits.  However, Ballard's failure to timely respond constitutes a waiver of factual challenges.  Therefore, the Statement of Undisputed Facts submitted by Defendants, which was not challenged by Ballard, is accepted as uncontested.  D.N.M.LR-Civ. 56-1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Ballard's failure to file a timely response that properly challenges Defendants' Undisputed Facts precludes her from presenting evidence sufficient to show the existence of a genuine issue of material fact for trial.[2]  *See* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Notwithstanding this failure, the Court analyzes whether Defendants' Undisputed Facts demonstrate an entitlement to summary judgment on each of Ballard's claims.

## Summary Judgment Standard

Summary judgment provides courts with a means by which "factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986).  Rule 56(a) requires the court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[2]A *pro se* litigant's "pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers."  <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, the Tenth Circuit Court of Appeals repeatedly insists that *pro se* parties follow the same rules of procedure that govern other litigants. <u>Garrett v. Selby Connor Maddux & Janer</u>, 425 F.3d 836, 840 (10th Cir. 2005).

Fed. R. Civ. P. 56(a) (2012).  The party seeking summary judgment has an initial burden to show that there is an absence of evidence to support the non-moving party's case.  *See* <u>Kannady v. City of Kiowa</u>, 590 F.3d 1161, 1168-1169 (10th Cir. 2010) ("moving party has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.") (internal quotation marks removed).

Upon meeting that burden, the non-moving party must identify specific facts that show the existence of a genuine issue of material fact.  <u>Id.</u>  The non-moving party may not rest upon mere conjecture, allegations, or denials, nor may a party rely solely on argument or contentions.  <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 248 (1986).  *See* <u>Pasternak v. Lear Petroleum Exploration, Inc.</u>, 790 F.2d 828, 834 (10th Cir. 1986) ("Conclusory allegations, general denials, or mere argument of an opposing party's case cannot be utilized to avoid summary judgment.") (citation omitted).  *See also* <u>Nahno-Lopez v. Houser</u>, 625 F.3d 1279, 1283 (10th Cir. 2010) ("in response to a properly supported motion for summary judgment, a non-movant must produce sufficient evidence for a reasonable trier of fact to find in its favor at trial on the claim or defense under consideration").  The evidence produced must be competent and legally admissible.  *See* <u>Celotex</u>, 477 U.S. at 323 n.3.

The Court further observes that the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson</u>, 477 U.S. at 247-48 (emphasis in original).  Stated differently, "the movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." <u>Kannady</u>, 590 F.3d at 1169 (citation omitted).  *See also* <u>Celotex</u>, 477 U.S. at 323 (Rule 56 standard requires the court to enter summary judgment "against a party who fails to make a showing sufficient to establish the

existence of an element to prove that party's case, and on which that party will bear the burden of proof at trial.")

As recently explained by the federal Utah District Court, in <u>Wilcox v. Career Step, LLC</u>, __ F. Supp. 2d __, 2013 WL 839936, at *4 (D. Utah Mar. 6, 2013) (unpublished) –

> . . . . now as before the 2010 amendments to Rule 56, the court must perform "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson</u>, 477 U.S. at 250. "When applying this standard, we examine the factual record in the light most favorable to the party opposing summary judgment." <u>Kannady</u>, 590 F.3d at 1168 (<i>quoting</i> <u>Belhomme v. Widnall</u>, 127 F.3d 1214, 1216 (10th Cir. 1997)).

Thus, while the Court examines the factual record in the light most favorable to Plaintiff, mere assertions, conjecture, or the existence of a scintilla of evidence in support of his position will not demonstrate a genuine issue of material fact for trial.  <u>Carpenter v. Boeing Co.</u>, 456 F.3d 1183, 1192 (10th Cir. 2006) (citations and quotations omitted).

## **Present Motion**

In support of their Motion for Summary Judgment, Defendants submit the following material facts that the Court deems uncontested.

> 1.  Plaintiff Linda Ballard was arrested on September 20, 2008 and charged with one count of violating an order of protection granted by a court under the Family Violence Protection Act.  (Exhibit A, Criminal Complaint).
>
> 2.  Following her arrest, Plaintiff was transported to the Northeastern New Mexico Detention Facility ("NENMDF"), arriving at approximately 11:00 a.m.  (Exhibit A-1, Arrest/Booking Report, Exhibit B, Affidavit of Warden Tim Hatch).
>
> 3.  NENMDF houses state inmates pursuant to a contract between Union County and the New Mexico Corrections Department. (Exhibit B).  However, a portion of the NENMDF is reserved for use

6

as the jail for Union County.  (Exhibit B).  Defendant GEO contracts with Union County to operate both the correctional facility and the jail.  (Exhibit B).

4.  Defendant Martin was the Associate Warden of the NENMDF at the time of Plaintiff's detention.  (Exhibit B).  Defendant Lieutenant Grayson was a supervisor at the jail at the time of Plaintiff's detention.  (Exhibit B).  Defendant Debra Vega-Cowan was the mental health director at the time of Plaintiff's detention.  (Exhibit B).

5.  In accordance with jail procedures, Plaintiff was evaluated by medical personnel at 12:30 p.m.  (Exhibit B, Exhibit C, Operating Procedures for Detainees; Exhibit D, General Intake Screening Questionnaire).

6.  GEO does not employ or contract with medical personnel at NENMDF.  (Exhibit B).

7.  At the time of Plaintiff's detention medical services at NENMDF were provided by a private medical contractor called Correctional Medical Services ("CMS").  (Exhibit B).

8.  CMS contracted with the New Mexico Corrections Department, not with GEO, to provide medical services to inmates and detainees at NENMDF.  (Exhibit B).

9.  The medical records maintained by CMS indicate that as of 12:30 p.m., Plaintiff was exhibiting signs of mental health problems and also indicate Plaintiff was taking a number of prescription medications, including Percocet, Lisinopril, Elavil[3], Clonazepam,[4] and Zantac.  (Exhibit D).

10.  The medical department subsequently requested a mental health evaluation/crisis referral for Plaintiff.  (Exhibit E, Referral to Mental Health).  The mental health referral sheet indicates that Plaintiff was

---

[3]"Elavil is in a group of drugs called tricyclic antidepressants. Elavil affects chemicals in the brain that may become unbalanced.  Elavil is used to treat symptoms of depression." http://www.drugs.com/elavil.html (5/22/2013).

[4]"Clonazepam is in a group of drugs called benzodiazepines (ben-zoe-dye-AZE-eh-peens). It affects chemicals in the brain that may become unbalanced and cause anxiety. Clonazepam is used to treat seizure disorders or panic disorder."  http://www.drugs.com/search.php?searchterm=Clonazepam (5/22/2013).

singing, tearful, demanding medication, and experiencing "delusions of grandeur." (*Id.*)  Her condition continued to escalate as the afternoon progressed. (*Id.*)[5]

13.  Mental Health Director Debra Vega-Cowan evaluated Plaintiff at 6:30 p.m. (Exhibit B; Exhibits F and F-1, Documentation Notes: Exhibits G and G-1, Suicide Prevention/Therapeutic Watch Sheet; Exhibits H and H-1, Incident Report-Crisis Intervention Sheets; Exhibit I and I-1, County Inmate Mental Status Evaluation Sheet). Ms. Vega-Cowan, a licensed mental health practitioner, observed Plaintiff in a holding cell curled up in a ball by the door. (*Id.*) Plaintiff appeared disheveled and had "flighted thoughts." Plaintiff was also disoriented and angry. (*Id.*)  Plaintiff reported to Ms. Vega-Cowan that she did not want to be at NENMDF and that she would bang her head on the cement until she got her way. (*Id.*)  Plaintiff also demanded Percocet and Clozopine.[6] (*Id.*)  At that time, Ms. Vega-Cowan directed that Plaintiff be placed on suicide watch for her safety. (*Id.*)

14.  Ms. Vega-Cowan directed staff to place Plaintiff on continuous one-on-one observation. (Exhibits F-I).  Ms. Vega-Cowan ordered that Plaintiff be permitted only a suicide blanket, suicide garment, and slip-on shoes. (*Id.*)  Plaintiff was not permitted access to a mattress, blanket, sheets or any paper. (*Id.*)

15.  Plaintiff was escorted to medical holding at 7:57 p.m. (Exhibit J, Interdisciplinary Progress Notes).  Rhonda Green, a female technician, was ordered to report to the jail from her post to assist Plaintiff with the removal of her clothing and to monitor Plaintiff in accordance with Ms. Vega-Cowan's directives. (*Id.*; Exhibit K, Affidavit of Rhonda Green).  No male staff members were present in the room while Plaintiff was changing out of her street clothes, nor were any male staff members able to view Plaintiff while she was unclothed. (Exhibit K).

---

[5]Defendants either mis-numbered the facts or omitted fact numbers 11 and 12, as the numbering skips from 10 to 13. [Doc. 156, at 3-4.]

[6]"Clozapine is an atypical antipsychotic medication used in the treatment of schizophrenia, and is also sometimes used off-label for the treatment of bipolar disorder." http://en.wikipedia.org/wiki/Clozapine (5/22/2013).

16.  Medical staff administered Elavil and Klonepin [trade name for Clonazepam] to Plaintiff while she was in the medical holding room. (Exhibit J; Exhibit L, Medication Administration Record).

17.   Ms. Green remained outside the medical holding room, observing Plaintiff's activities for approximately 30-45 minutes. (Exhibit K ).

18.  At 8:58 p.m., the facility received an Order from the magistrate judge to release Plaintiff on her own recognizance.  (Exhibit M, Release Order and Bond).

19.  Plaintiff was informed that she would be released and was taken back to the intake department and given her clothing.  (Exhibit K).

20.   However, Ms. Vega-Cowan had advised that Plaintiff was undergoing a profound mental health crisis and that she should be closely monitored because she posed a danger to herself and to the community.  Staff at the facility communicated Ms. Vega-Cowan's opinions regarding Plaintiff's mental health crisis to the magistrate judge, and it was agreed that Plaintiff should remain in the facility pending transfer to the behavioral health institute in Las Vegas. (Exhibit B; Exhibit J).

21.  Plaintiff was returned to the medical segregation unit at that time so that the suicide watch could be resumed.  (Exhibit J; Exhibit K). Plaintiff was very angry and belligerent when she returned to medical holding.  (Exhibit K).  When Plaintiff was instructed to disrobe, the male staff left the area.  (*Id.*) Ms. Green observed Plaintiff by herself until 11:30 p.m., when she was joined by Control Tech Shelley Wilson.  (*Id.*)  They both observed Plaintiff until 6:00 a.m. on September 21, 2008.  (*Id.*)  Plaintiff was very angry whenever she woke up.  Plaintiff was provided a second suicide gown for warmth. (*Id.*)

22.   Plaintiff exposed herself to a male staff member, Lt. Rusty Rippetoe, when he entered medical holding to check on Plaintiff's status.  (*Id.*)  The following morning, Lt. Rippetoe attempted to deliver breakfast to Plaintiff.  (*Id.*).  Plaintiff refused to eat.  (*Id.*)

23.  Medical staff was unable to complete an evaluation of Plaintiff in the morning because of her extreme state of agitation.  (Exhibit N, On-Call Provider Checklist).

24. Plaintiff was reevaluated by Ms. Vega-Cowan in the morning of September 21. Ms. Vega-Cowan observed Plaintiff displaying violent, out of control behavior, including banging on windows and kicking her cell door. (Exhibit O and O-1, Documentation Notes). Plaintiff threatened to "ruin" Ms. Vega-Cowan for placing her on suicide watch and stated that she was happy to sue the facility because she needed money. (*Id.*) She made obscene remarks to the corrections staff. (*Id.*)

25. It was confirmed that Plaintiff needed to be referred to the behavioral health institute in Las Vegas, New Mexico for further evaluation. (Exhibits O and O-1). Arrangements were then made to have Plaintiff transferred to the county hospital, where she would be held until she could be transferred to Las Vegas. (*Id.*) When Plaintiff was informed she would be taken to the County Hospital, she calmed down. (*Id.*)

26. Plaintiff left NENMDF via ambulance at approximately 12:30 p.m. on September 21. (Exhibit P, Transfer Records).

27. Defendant Vega-Cowan acted within the professional standard of care in recommending that Plaintiff be held for observation, eventually placed on suicide watch, and finally referred for psychiatric hospitalization. (Exhibit Q, Report of Samuel Roll, Ph.D.).

28. The behaviors of Plaintiff that were reported by Ms. Vega-Cowan, including extreme anger, loss of control, head banging on door and window, delusion, flighted ideas and curling up in a ball, along with Plaintiff's history of bipolar disorder, left Ms. Vega-Cowan with no professional, ethical or humane alternative than to recommend Plaintiff be held for observation and placed on suicide watch. (Exhibit Q).

29. The failure to contain Ms. Ballard and put her on suicide watch "would have put Ms. Vega-Cowan in conflict with the ethical and professional guidelines of mental health workers, and may have put Ms. Ballard's health and life, and the well-being of the community at life [sic?] at risk." (Exhibit Q).

30. Training is provided to all corrections officers and staff who are assigned to work directly with detainees and inmates. (Exhibit B).

31. The training includes instruction in mental health issues. (Exhibit B).

32. However, as corrections officers and staff are not licensed mental health professionals, they are instructed and expected to defer to the judgment and orders of the facility's licensed mental health director with respect to mentally ill detainees and inmates. (Exhibit B).

33. Corrections staff acted in accordance with their duties and with the standard of care that applies to their conduct when they followed Ms. Vega-Cowan's advice and instructions regarding Plaintiff's detention. (Exhibit B).

34. NENMDF maintained appropriate staffing levels throughout the period of Plaintiff's detention on September 20 and 21, 2008. (Exhibit B).

35. Plaintiff received no less than one-on-one supervision during the entire period of her detention. (Exhibit B).

36. GEO provides training to all corrections officers and staff who are assigned to work with detainees and inmates. (Exhibit B).

37. The training provided by GEO includes training in how to deal with mentally ill inmates. (Exhibit B).

38. GEO provided licensed mental health personnel at NENMDF. (Exhibit B).

[Doc. 156, at 2-8].

## Discussion

## I.   FEDERAL CONSTITUTIONAL CLAIMS AGAINST GEO

As to named Defendant GEO, the law in the Tenth Circuit is clear: "a private corporation such as GEO Group, Inc., 'cannot be held liable solely because it employs a tortfeasor—or, in other words ... cannot be held liable under § 1983 on a respondeat superior theory.'" Smedley v. Corr. Corp. of Am., 175 F. App'x. 943, 946 (10th Cir. 2005) (unpublished) (*quoting* Monell v. Dep't of

Soc. Servs. of New York, 436 U.S. 658, 691 (1978)).[7]  *See* Dubbs v. Head Start, Inc., 336 F.3d 1194,

1215-17 (10th Cir. 2003) (holding that a private entity can only be held liable under Section 1983

if it had a policy that was the direct cause or moving force behind the constitutional violations), *cert.*

*denied*, 540 U.S. 1179 (2004).  "[I]n order to hold [a private entity acting under color of state law]

liable for the alleged tortious acts of its agents [Plaintiff] must show that [the private entity] directly

caused the constitutional violation by instituting an 'official municipal policy of some nature,'... that

was the 'direct cause' or 'moving force' behind the constitutional violations." Smedley, 175 F.

App'x at 946.  *See also* Carey v. Lawton Corr. Facility, 2008 WL 200053, at 1, 3 (W.D. Okla. Jan.

24, 2008) (unpublished) ("As a private corporation, Defendant Geo Group, Inc., cannot be

vicariously liable under 42 U.S.C. § 1983[;]" "A corporation is not liable for the constitutional tort

of its employees unless the constitutional tort was caused by a policy or custom of the corporation.")

(citations omitted).

    In her Amended Complaint, Ballard makes unsubstantiated allegations about GEO's

"national policies and procedures." [Doc. 10, ¶ 28.]  For example, she claims her alleged damages

were the "direct results of The GEO Group's policy of deliberate indifference regarding detainee's

civil rights." [Doc. 10, ¶ 37; *see also* ¶ 47 (GEO "maintains a policy of deliberate indifference . . .

.").] Ballard further asserts that GEO failed to adequately train their detention personnel regarding

how detainees should be handled so as to avoid civil rights violations. [Id.] In addition, Ballard

_____

    [7]While Monell applied to municipal governments and not private entities acting under color of
state law, Court noted that it was well settled that Monell also extends to private defendants sued under §
1983.  Smedley, 175 F. App'x at 946 (citation omitted). Thus, to establish municipal liability or liability
of a private defendant such as GEO, a plaintiff must show: 1) the existence of a municipal policy or
custom and 2) a direct causal link between the policy or custom and the injury alleged.  Graves v.
Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006) (*citing* City of Canton, Ohio v. Harris, 489 U.S. 378, 385
(1989).

contends that GEO hires unqualified employees with minimal education and trains them via a "quasi-military regime." [Id., ¶¶ 39, 43.]

All of Ballard's allegations concerning GEO policies are unsupported and conclusory in nature. She provided no admissible evidence to support the allegations, nor did she identify any actual policies. While such allegations might have permitted Ballard's claims against GEO to survive Rule 12(b)(6) pleading requirements, on summary judgment, Ballard may not rest on mere conjecture or unsubstantiated allegations, arguments, or contentions. She must come forward with admissible evidence of such policies, along with evidence that a policy was the "direct cause or moving force" behind the alleged constitutional violations.

Defendants provided affidavit testimony and undisputed facts demonstrating GEO provides adequate and appropriate training to all corrections officers and staff who work with detainees and inmates, and that such training includes instruction in mental health issues. It is further undisputed that with respect to mentally ill detainees, corrections officers and staffs follow instructions of the orders of the facility's licensed mental health director, in this case, Vega-Cowan. It is uncontested that corrections staff acted in accordance with their duties and with the standard of care that applied to their conduct when they followed Vega-Cowan's instructions and advice concerning Ballard's detention. Ballard did not challenge, through admissible evidence, Defendants' undisputed fact that it maintained appropriate staffing levels at the pertinent time.

Because Ballard came forward with no admissible evidence to hold GEO liable for alleged constitutional violations, based on the existence of a policy or custom, the Court recommends that all federal constitutional claims against GEO be denied and dismissed. Moreover, for the reasons explained below, the Court determined that Ballard presented no evidence of a constitutional violation committed by GEO employees. A municipality, or in this case, the private corporation,

may not be held liable where there was no underlying constitutional violation by any of its officers. Graves, 450 F.3d at 1225 (citation omitted).

A.    Eighth Amendment Legal Standard and Claims

"The Eighth Amendment provides prisoners the right to be free from cruel and unusual punishments." Boyett v. County of Washington, 282 F. App'x 667, 672 (10th Cir. June 19, 2008) (unpublished), cert. denied, 555 U.S. 1049 (2008). A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976); Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005). "Deliberate indifference" involves both an objective and a subjective component. See Farmer v. Brennan, 511 U.S. 825, 834 (1994); Self v. Crum, 439 F.3d 1227, 1231 (10th Cir.), cert. denied, 549 U.S. 856 (2006). The objective component is met if a deprivation is "sufficiently serious," which requires that "it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999) (citations and quotation omitted). The subjective component is met if a prison official "knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837.

    1.    *Failure to Prescribe Medications*

Ballard contends that her Eighth Amendment rights were violated because she was not provided prescription medications for a "known disability."[8] [Doc. 10, Claim 4, ¶ 46]. Ballard asserts that "she made it known to everyone with whom she came into contact, that she had a

---

[8]In an earlier Order [Doc. 181], the Court concluded that if Ballard intended to bring a claim under the Americans with Disabilities Act ("ADA"), her Amended Complaint failed to state a claim. The Court dismissed any such claim, without prejudice. [Doc. 181, at 4.]

disability . . . ., and takes regular medication for severe back pain."  "Not one employee of GEO made any effort to accommodate her disability." [Doc. 10, ¶ 46.] Ballard contends that "they" had her prescriptions and refused to give them to her." [Id.][9]

Nowhere in the Amended Complaint did Ballard allege that individual Defendants Martin, Grayson, or Vega-Cowan were personally involved in withholding any medications.  Ballard summarily asserts, without any supporting admissible evidence, that the individual Defendants "were very obviously not up to the task of implementing reasonable conduct regarding the civil rights of detainees." [Id., ¶49, 50.] However, Ballard provides no admissible evidence that any individual Defendant knew of and disregarded an excessive risk to Ballard's health or safety or that individual Defendants refused to give Ballard prescribed medication.

A plaintiff alleging a claim for denial of her constitutional rights pursuant to § 1983 must demonstrate that the defendants each were personally involved in the alleged constitutional violation.  Stewart v. Beach, 701 F.3d 1322, 1328 (10th Cir. 2012).  One can be liable only for the acts or omissions committed by that individual.  As there are neither allegations nor evidence to demonstrate that Martin, Grayson or Vega-Cowan withheld medication or medical care, the claims against them for failing to dispense prescriptive medications must be dismissed.  See Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996) (holding that "[p]ersonal participation is an essential allegation in a § 1983 claim.").

_____

[9]In her Amended Complaint, Ballard alleged that she was "totally and permanently disabled due to severe disc disease and severe spine pain." [Doc. 10, ¶ 10.] Ballard further asserted that she does not suffer from any mental illness" and is "as normal as most everyone about her mental health . . . ." [Id., ¶ 27.] Notwithstanding these allegations, it is undisputed that Ballard's son, on the date in question, had in place an order of protection, forbidding his mother from being within 100 yards of his residence. [Doc. 156, Ex. A.] It also is uncontested that at Ballard's intake screening, she reported taking not only a prescription pain medication but also prescription anti-depressant and anti-anxiety medications. [Id., Ex. D.]

Ballard failed to demonstrate that a GEO employee was personally involved in the alleged unconstitutional conduct. *See* Myers v. Okla. County Bd. of County Comm'rs, 151 F.3d 1313, 1316 (10th Cir. 1998). Because Ballard did not demonstrate that any GEO Defendant or employee was personally involved in the alleged unconstitutional conduct, the Eighth Amendment claim against GEO Defendants must be dismissed.

In addition, Defendants' Undisputed Facts show that GEO employees were not responsible for providing medication to detainees at NENMDF. Rather, the undisputed evidence demonstrates that CMS, an independent contractor, provided medical care and dispensed medication to Ballard during her detention.

Moreover, a court cannot determine deliberate indifference if the plaintiff failed to identify the alleged culprit or employee who allegedly refused to dispense prescription medication. *See* K.F.P. Dane County, 110 F.3d 516, 519 (7th Cir. 1997) (dismissing claim of cruel and unusual punishment due to the plaintiff's failure to "point the finger at any specific prison guards"). For the above-stated reasons, the Court recommends denial and dismissal of the Eighth Amendment claim against Defendants based on allegations regarding a refusal to give Ballard prescribed medications.

## 2. *Housing Conditions*

Ballard may intend to assert anther Eighth Amendment claim based on her concerns with conditions of housing at NENMDF. Ballard contends that she was kept overnight in a cell that had no bed or chair. Those allegations, however, are simply insufficient to show deliberate indifference on the part of Defendants. It is undisputed that Ballard's conduct was strange and that it alerted Defendants to Ballard's need for medical evaluation and attention. Observations of her curled up in a fetal position, appearing disheveled and having "flighted thought," engaging in head banging, appearing disoriented and angry, yelling, and speaking in obscenities, would lead a reasonably well-

16

qualified mental health care giver to believe that Ballard could harm herself.  Indeed, it is uncontested that the medical department at NENMDF conducted an evaluation and crisis referral for Ballard.  Defendant Vega-Cowan directed the staff to place Ballard on continuous one-on-one observation so as to guard against a suicide attempt.  Ballard was permitted only a suicide blanket, suicide garment and slip-on shoes.

There simply is no evidence that Defendants acted with deliberate indifference to Ballard's medical condition.  To the contrary, the undisputed facts demonstrate that Defendants and NENMDF medical staff took every possible precaution to ensure Ballard's safety under the circumstances.  Thus, to the extent that Ballard intended to assert an Eighth Amendment claim against Defendants regarding general housing conditions or denial of specific room furniture, the Court recommends that the claim be denied and dismissed against all Defendants.

### 3. *Removal of Clothing and Transportation to Hospital*

Ballard asserts that Defendants subjected her to cruel and unusual punishment in violation of the Eighth Amendment by requiring her to disrobe in front of male facility staff and by transporting her to the hospital in a manner that was intended to cause her public humiliation.  [Doc. 10, Claim 6, ¶ 57.] Ballard alleged that there were male guards who were standing and watching her as she was ordered to remove all her clothing. [Id.]

The Court observes that removal of clothing from a potentially suicidal patient is nothing more than a reasonable safeguard implemented to prevent the individual from harming herself.  For example, blankets that can be cut, stripped and tied into a noose could form an implement of death.  So, too, shoelaces, belts or other items of clothing, that could be stripped and fashioned into a

garrote[10] pose a significant risk of harm.  It is important to note that Defendants' Undisputed Facts show that throughout the time Ballard was on suicide watch, she was continually monitored by one and, at times, two professional observers.

Ballard contends that it is cruel and unusual punishment and a violation of her Eighth Amendment right to be undressed in front of male facility staffers.  However, affidavits submitted by Defendants demonstrate that at no time was Ballard disrobed by male staffers, nor were any male attendants in her presence while she removed her clothing.  Ballard did not submit any affidavit or admissible evidence to contradict these statements.  Thus, Defendants' facts before the Court are unrebutted.

According to Defendants' undisputed facts, the only indication of a male employee seeing Ballard without clothes occurred when Plaintiff exposed herself to a male staff member, Lt. Rusty Rippetoe, when he entered medical holding to check on Ballard's status.  This statement, along with Defendants' other material facts, is unrebutted and accepted as true. [Doc. 156, Ex. K.]  Thus, if Ballard exposed herself to a male staff person, she cannot now contend that being seen by a male in a disrobed condition constituted a violation of her right when she occasioned the incident.

Moreover, Ballard herself did not identify any of the guards or employees who directed her to remove her clothing, nor did she identify any male employees who watched her disrobe.  She brings the claim against "all those who participated, known and unknown," yet she did not allege personal participation on the part of any specific individual Defendant.  Thus, the Eighth Amendment claim, based on these allegations, fails for all of the reasons set out above, and the Court recommends that it be denied and dismissed.

---

[10]A garrote is a hand-held ligature of chain, rope, scarf, wire, cord or manofilament fishing line which can be used to strangle a person.  http://en.wikipedia.org/wiki/Garrote.

Ballard also complains that the method in which she was transported to the general hospital caused her humiliation.  For example, she alleges that there "was no useful purpose in making [Ballard] . . . wait until after 11 am the next day to be paraded with 5 vehicles, siren's blaring and lights flashing into town to the Union County General Hospital Emergency Room.  Only one conclusion is that the whole charade . . . was all a big joke to someone." [Doc. 10, Claim 7, ¶ 60; ¶ 22 ("[t]here were two Clayton Police Department squad cars in front of ambulance, one police squad car, and a fire department truck behind."  "These tactics were simply an effort to embarrass [Ballard] . . . .").]

Based on the undisputed facts, it was confirmed that Ballard required a referral to the behavioral health institute in Las Vegas, New Mexico, for further evaluation on September 21, 2008.  Ballard then was transported via ambulance to that facility.  There is no evidence that GEO, its employees, or any Defendant, were involved in determining the method, means or manner of transportation.  That is, no GEO employee directed the transport officers to employ lights or sirens, or directed that additional vehicles accompany the ambulance to the hospital.

Moreover, again, Ballard's Amended Complaint fails to allege participation by any GEO employee or Defendant in the transportation of Ballard from the facility to the hospital.  Because there is no admissible evidence to demonstrate participation by Defendants GEO or its employees, there is no basis for a jury to conclude that Defendant or a GEO employee acted with deliberate indifference to Ballard with respect to her transfer to the Las Vegas facility.  Thus, the Court recommends denial and dismissal of the claim against Defendants.

### 4. *Vega-Cowan's Treatment of Ballard*

It is unclear whether Ballard contends that the referral to the Las Vegas facility violated her Eighth Amendment rights.  However, it is abundantly clear, as well as undisputed, that Vega-

19

Cowan's observation of Ballard's behavior confirmed that Ballard was a danger to herself or others, and that a request for a mental health evaluation at the state facility was entirely appropriate.

Additionally, Defendants' expert, Dr. Samuel Roll, a witness who has testified as an expert in federal court on multiple occasions, opined that it would have been below the standard of care for Vega-Cowan to have allowed Ballard to be released into the community without a further evaluation. [Doc. 156, Ex. Q.]  Thus, it was entirely appropriate for Vega-Cowan to have Ballard evaluated at the mental health facility in Las Vegas.  Accordingly, to the extent that Ballard sought to raise an Eighth Amendment claim based on Vega-Cowan's referral of Ballard to the hospital, the Court recommends that the claim be denied and dismissed.

B.     Alleged Violation of Right to Privacy

"A constitutional right to privacy exists in certain forms of personal information a governmental entity possesses if 'an individual has a legitimate expectation . . . that it will remain confidential while in the state's possession.'" Ballard v. Town of Clayton, et al., No. CIV 10-1161 JAP/LFG [Doc. 5, at 7] (D.N.M. Jan. 3, 2011) (unpublished) (citing Sheets v. Salt Lake County, 45 F.3d 1383, 1387 (10th Cir. 1995)).  "If an individual has a legitimate expectation of confidentiality, then disclosure of such information must advance a compelling state interest which, in addition, must be accomplished in the least intrusive manner."  Id. (citing Sheets, 45 F.3d at 1387.)

Ballard complains that Defendants violated her privacy rights when Vega-Cowan "brought with her, some privileged information from Tri-County Community Service, Inc." about Ballard's condition. [Doc. 10, Claim 3, ¶ 43.] She further asserts that she had a "legal right to privacy in regards to all her records [at Tri-County]." [Id.] According to Ballard, Vega-Cowan did not have accurate information, and any information she acquired was "fueled by unsubstantiated rumors." [Id.]

20

Ballard's allegations that Vega-Cowan brought confidential medical information about Ballard from another facility are unsubstantiated, speculative, and specious. Ballard provided no admissible evidence demonstrating that Vega-Cowan improperly acquired confidential information from another facility.

Here, the undisputed facts demonstrate that Vega-Cowan based her medical/mental health decisions, on the date in question, upon reports of staff and her own first-hand observations of Ballard's behavior at NENMDF. Thus, while Ballard has a constitutional right to privacy with respect to certain types of information, she provided no admissible evidence to raise a genuine issue of material fact with respect to an alleged violation of that right. In other words, at the summary judgment stage, Ballard must come forward with more than conclusory allegations and conjecture. She must produce sufficient, admissible evidence for a reasonable trier of fact to find in her favor on this claim. This, Ballard failed to do. Accordingly, the Court recommends that the privacy violation claim be denied and dismissed.

To the extent that Ballard's privacy claim actually is more akin to a claim of medical negligence/malpractice or deliberate indifference to her serious medical needs by Vega-Cowan, Ballard must support such claims with expert medical testimony. *See* Pharmaseal Labs. v. Goffe, 90 N.M. 753, 757-58 (1977) ("Negligence of a doctor in a procedure which is peculiarly within the knowledge of doctors, and in which a layman would be presumed to be uninformed, would demand medical testimony as to the standard of care.") With respect to such claims, "it is settled law in [New Mexico] that expert testimony is generally necessary to prove whether or not the doctor's handling of the case was within recognized standards of medical practice in the community." Crouch v. Most, 78 N.M. 406, 410 (1967). *See also* Zuls v. United States, 60 F.3d 838 (Table, Text in Westlaw), 1995 WL 397067, at *3 (10th Cir. 1995) (unpublished) ("Absent production of expert

testimony explaining wherein the conduct of the [defendant] fell below the standard of performance recognized in the community, there could be no issue of fact for a jury to pass on.")   Ballard provided no such expert testimony.

Ballard's failure to submit an affidavit or any evidence from a reasonably, well-qualified medical expert to support her claim that Defendants' conduct fell below the acceptable standard of care is fatal to her claim.  Dr. Roll's undisputed testimony is that the health care provided to Ballard was at all times consistent with the applicable standard of care.  He states that the failure to contain Ballard and failure to put her on suicide watch "would have put Ms. Vega-Cowan in conflict with the ethical and professional guidelines of mental health workers, and may have put Ms. Ballard's health and life, and the well being of the community at large at risk." [Doc. 156, Ex. Q.]

Had Vega-Cowan not reported her observations about Ballard's conduct, she risked violating the standard of care.  This is especially true here, in view of the undisputed facts concerning Ballard's conduct, including staff observations of her singing, tearfulness, demands for medications, and experiences of "delusions of grandeur."  Moreover, staff noted that Ballard's inappropriate conduct was escalating, such that it required the attention of Vega-Cowan, who was the mental health director.  Vega-Cowan observed Ballard to be "disheveled" with "flighted thoughts."  Ballard appeared disoriented and angry.  She told Vega-Cowan "she would bang her head on the cement bench she was sitting on to get her way."  Ballard also was seen banging the windows (apparently with her head) and kicking the door. [Doc. 156, Exhibits F-1, G-1, H-1, K-1, Q.]

Based on these circumstances, that are uncontested by admissible evidence, had Vega-Cowan not acted to place Ballard on continuous one-on-one suicide watch, she might very well have been negligent in her treatment of Ballard.  Indeed, if not for Vega-Cowan's treatment, a tragedy could well have occurred.

22

For all of the above-stated reasons, the Court recommends that Ballard's possible medical negligence claim be denied and dismissed.

C.    Fourth Amendment Claim

With respect to the Fourth Amendment claim based on false imprisonment, an individual may have such a claim if she was imprisoned without legal process.  Mondragon v. Thompson, 519 F.3d 1078, 1982 (10th Cir. 2008).   "To maintain a malicious prosecution, false arrest, or false imprisonment claim under § 1983, plaintiffs must demonstrate the elements of a common law claim and show that their Fourth Amendment right to be free from unreasonable search and seizure has been violated."  Trimble v. Park County Bd. of Com'rs., 242 F.3d 390 (Table, Text in Westlaw), 2000 WL 1773239, at *3 (10th Cir.2000) (unpublished).   Based on New Mexico law, if police had probable cause for the arrest, this generally precludes a claim for false imprisonment. See Kerns v. Bader, 663 F.3d 1173, 1190 (10th Cir. 2011).

Because police had probable cause to arrest Ballard [see Doc. 5 in 10cv1161], a claim of false imprisonment necessarily fails.  However, Ballard's claim is somewhat unclear.  She appears to allege false imprisonment on September 20, 2008, after the facility received an order from a magistrate judge to release Ballard on her own recognizance.  [Doc. 10, Claim 5, ¶ 53.] It is uncontested that Ballard initially was advised she would be released based on the magistrate judge's order, and she was taken back to the intake department and given her clothing.  The undisputed evidence is that, upon receipt of the magistrate judge's release order, the magistrate judge was contacted and updated as to Vega-Cowan's observations regarding Ballard's mental health crisis and the risk of harm that could befall Ballard if released without care and supervision.  The magistrate judge then rescinded his release order, and it was agreed that Ballard would remain in the facility pending transfer to the behavioral health institute in Las Vegas.

Ballard was then returned to the medical segregation unit, and the suicide watch was resumed. She was observed to be very angry and belligerent when returned to medical holding. It is apparent that at all material times, Ballard was under lawful detention, and the fact that the magistrate judge rescinded his order does not turn an otherwise lawful arrest into an unlawful detention. Ballard continued to be held on the basis of a court order. There simply are no grounds to support a false imprisonment claim based on the undisputed facts that Ballard was properly arrested and that she continued to be held in accordance with a court order.

Moreover, Vega-Cowan's notification to the magistrate judge and presentation of the serious likelihood of harm to Ballard or to others was necessary to ensure that neither Ballard nor others would be harmed. Dr. Roll opines that the behaviors exhibited by Ballard, including the extreme anger, loss of control, head banging on the doors and windows, delusions, flighted ideas and curling up in a ball, along with Ballard's history of bipolar disorder, left Vega-Cowan with no professional, ethical or humane alternative than to recommend that Ballard be held for observation and placed on suicide watch. Had she failed to take this appropriate action, Vega-Cowan would have violated the standard of care required of her.[11]  Indeed, as earlier noted, Ballard presented no medical expert to provide a contrary opinion and did not rebut any of Defendants' assertions of facts.

In addition, Ballard did not allege that GEO employees, Martin, or Grayson had any personal involvement in returning Ballard to medical holding after the magistrate judge initially ordered her to be released. Thus, Ballard presented no evidence to support a false imprisonment claim against

---

[11]Moreover, while Ballard asserts "just as she predicted," the original criminal charges were dropped, this does not mean that police offices lacked probable cause to make the arrest. Indeed, according to pleadings in Ballard's related case [Doc. 5, at 6, in No. CIV 10-1161], Ballard admitted that she was arrested on the date in question for violating a protective order prohibiting her from going within a certain distance of her son's house.

them.  In addition, as discussed above, the undisputed evidence is that no such claim survives as to Vega-Cowan.

In sum, Ballard failed to demonstrate an existence of material fact with respect to the Fourth Amendment claim.  Thus, the Court recommends that it be denied and dismissed.

D.     First Amendment Claim

The Free Exercise Clause of the First Amendment mandates that prison authorities afford prisoners reasonable opportunities to exercise religious beliefs that are sincerely held.  *See* O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) ("[i]nmates ... retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion.").  However, prisoners' free exercise rights are subject to prison restrictions that are rationally related to legitimate penological interests.  Id., 482 U.S. at 349.  "[C]ourts are not to substitute their judgment on matters of institutional administration for the determinations made by prison officials, even when First Amendment claims have been made."  Kikumura v. Hurley, 242 F.3d 950, 956 (10th Cir. 2001).

Ballard asserts a violation by GEO, Martin and Grayson of a First Amendment right to the free exercise of religious belief.  This contention purportedly concerns an instruction by Grayson that she stop singing in her cell.  [Doc. 10, Claim 8, ¶ 63].  Ballard alleges that she "always sings, hymns, prays, and dances when she feels overwhelmed" and that she felt "oppressed and sad" when "waiting in the ceramic tile shower."  She "escape[s] in prayer, song, and dance."  [Id.]

Ballard asserts that Grayson "made some ugly remarks" to Ballard and "ordered her to quit singing."  [Id.] While not alleging that any other specific Defendant or GEO employee ordered her to stop singing, Ballard summarily asserts that it was "an organized effort on the part of GEO" to

"vilify Ballard." [Id., ¶ 64.] Such summary and unsupported allegations are not sufficient to defeat summary judgment.

Ballard's claims clearly fail as asserted against Martin or GEO. She makes no allegations of personal participation by Martin or other GEO employees. Grayson, the individual who is alleged to have told Ballard to stop singing, states that he told Ballard to sing a little quieter. [Doc. 156, at 17.] Ballard's allegations, even if considered supported by admissible evidence, which they are not, simply do not demonstrate that Grayson violated Ballard's right to free exercise of religion. Indeed, Ballard did not even allege that Grayson or a GEO staff member prohibited her from praying. Moreover, managing noise levels in a detention facility is an integral part of maintaining the security of a correctional institution, and controlling noise in an institution has a rational relationship to institutional security. Defendants argue:

> When inmates or detainees sing, shout, hoot, rattle or bang objects in their cells or make any noise above what is anticipated during a normal speaking conversation, other inmates and detainees may become agitated and may engage in behavior that threatens the overall security of the facility. For this reason, correction officers at any NENMDF commonly instruct inmates or detainees to maintain normal volume levels and to cease any behavior that has the potential to antagonize or to be an annoyance to other individuals.

[Doc. 156, at 18].

The Court agrees. Even if there is some dispute whether the volume of the singing was sufficient to run the risk of antagonizing or annoying other individuals, it is clear that Defendants were motivated by legitimate penological interests, including the safety and security of all inmates, rather than religious issues. Ballard's First Amendment claim fails, and the Court, therefore, recommends that the claim be denied and dismissed.

26

## II.    STATE LAW CLAIMS AGAINST ALL DEFENDANTS OR UNNAMED OTHERS

Ballard also asserted several state law claims against Defendants for common law negligence and intentional infliction of emotional distress. [Doc. 10, Claims 1 ("Gross Negligence") and 2 (negligence for failure to train),[12] and Claim 7 ("Intentional Malicious Infliction of Physical and Mental Duress"). To some extent, Ballard's allegations of negligence were analyzed and rejected above.

Her negligence claims include assertions that GEO should be held liable for constitutional violations purportedly committed by its staff because of failure to train its employees. The problem is that Ballard failed to identify, with admissible evidence, a specific deficiency in GEO's training program that was so obvious and closely related to her alleged injuries that the program might be considered a moving force behind the alleged injuries. In Porro v. Barnes, 624 F.3d 1322, 1328 (10th Cir. 2010), the Tenth Circuit explained:

> To prevail [with such a claim], [Plaintiff] must demonstrate, among other things, that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of [his due process] rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need for additional training." It isn't enough to "show that there were general deficiencies in the county's training program for jailers." Rather, a plaintiff must "identify a specific deficiency" that was obvious and "closely related" to his injury, so that it might fairly be said that the official policy or custom was both deliberately indifferent to his constitutional rights and the moving force behind his injury.

Id. (internal citations omitted). Ballard failed to shoulder her burden in presenting admissible evidence identifying specific deficiencies in GEO's training programs.

---

[12]To the extent Ballard seeks liability under § 1983 for negligence, her allegations fail to state a valid claim for relief. See Rost v. Steamboat Springs RE-2 School Dist., 511 F.3d 1114, 1126 (10th cir. 2008) ("negligent . . . conduct is insufficient to prove liability under § 1983").

Similarly, to the extent that Ballard's negligence claim is premised on understaffing at NENMDF, she did not come forward with admissible evidence showing that the facility was understaffed on the date in question. Moreover, she failed to present evidence to contradict undisputed facts presented by Defendants that staffing was appropriate. Stated differently, Ballard did not identify expert witness testimony that staffing levels at NENMDF were insufficient. *See, e.g.,* Boyd v. Nichols, 616 F. Supp. 2d 1331, 1344-45 (M.D. Ga. 2009) (granting summary judgment to jail on claim of inadequate staffing where the plaintiff presented no evidence from any knowledgeable person to establish that the facility was understaffed).

Ballard's contentions that there was no medical staff on duty on the dates in question is contradicted by Defendants undisputed facts. Defendants demonstrated that medical care at NENMDF is provided by a private medical contractor, rather than GEO. Moreover, the evidence is uncontested that medical providers at NENMDF observed and evaluated Ballard several times during her detention. In addition, Vega-Cowan, a licensed mental health professional, evaluated Ballard several times in the 24-hour period of detention.

Because Ballard presented nothing but conclusory allegations in support of her negligence claims and failed to produce admissible evidence sufficient to contradict any of Defendants' genuine material facts, the Court recommends that the negligence claims be denied and dismissed.

To prevail on a claim on intentional infliction of emotional distress, Ballard must demonstrate evidence to support three elements: (1) Defendants' conduct was extreme and outrageous under the circumstances; (2) Defendants acted intentionally or recklessly; and (3) as a result of Defendants' conduct, Ballard experienced severe emotional distress. UJI 13-1628 NMRA 2012. The New Mexico Court of appeals defined "extreme and outrageous conduct" as that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

Silverman v. Progressive Broad., Inc., 1998-NMCA-107, ¶ 32, 125 N.M. 500 (internal citation and

quotation marks omitted).

Ballard's allegations, even if supported by admissible evidence, fall far short of

demonstrating such "extreme or outrageous" conduct on the part of Defendants.  There is no

evidence that Defendants acted "intentionally or recklessly" in allegedly causing Ballard's "severe

emotional distress."  The undisputed material facts demonstrate that Defendants acted reasonably,

appropriately, and within the professional standard of care in their treatment of Ballard during the

detention.

In sum, Ballard submitted no admissible evidence to counter Defendants' *prima facie*

showing of entitlement to judgment on the state law claims.  Therefore, for the same reasons the

constitutional claims fail, Ballard's common law claims must also be dismissed as she did not

submit admissible evidence raising a material issue of fact regarding the elements of the claims.

Therefore, the Court recommends that the claim for intentional infliction of emotional distress be

denied and dismissed.

## III.   FILING RESTRICTION WARNING

In the other case Ballard filed, relating to the underlying 2008 arrest, Senior District Judge

James A. Parker noted the following:

> Ballard has sued four individual Defendants in this case without
> making a single factual allegations regarding their personal
> involvement in any of the many wrongs she alleges.  She complains
> of acts that, if they were actionable, are now far beyond the statute of
> limitations.  Ballard is no stranger to federal litigation.  In Eckert v.
> Silverthorne, No. 00-1030, 25 F. App'x 679, 2001 WL 1152781 (10th
> Cir. July 9, 2001) [unpublished], in affirming summary judgment
> granted in favor of the town and its police officers on Ballard's
> claims for denial equal protection, substantive-due-process

> violations, failure to train, and failure to arrest, the Tenth Circuit
> carefully instructed Ballard regarding municipal liability and the
> consequences of failing to link "the failure to train to an injury of
> constitutional proportions." Id., at 690.  But Ballard repeated some
> of those errors in the Complaint at bar.

Linda Eckert Ballard v. Town of Clayton, New Mexico, No. CIV 10-1161 JAP/LFG [Doc. 5, at 11-12] (D.N.M. Jan. 3, 2011) (unpublished).  Judge Parker noted numerous lawsuits filed by Ballard (also under the name of Eckert) that courts dismissed for lack of subject-matter jurisdiction, under § 1915 for failure to state a claim, by the parties' stipulation, or because summary judgment was granted in favor of defendants.  Id. at 12 (listing Ballard v. McKee, No. CIV 08-113 [Doc. 9] (N.D. Tex. June 24, 2008); Ballard v. McKee, No. CIV 09-202 J [Doc. 23] (N.D. Tex. Sept. 28, 2010); Eckert v. City of Clayton, No. CIV 98-1364 MV/LFG [Doc. 25] (D.N.M. May 4, 1999); Eckert v. Lawter & Pitts, No. CIV 96-1853 R [Doc. 26] (W.D. Okla. July 8, 1997); Ballard v. Mercy Housing Sys., No. CIV 01-2174 WYD/MJW [Doc. 34] D. Colo. Sept. 13, 2002); Ballard v. RGB, Inc., No. CIV 97-444 ABJ [Doc. 28] (D. Colo. May 27, 1997).

Judge Parker warned Ballard in the case before him that if, without prepaying filing, she persisted in filing lawsuits in this Court that fail to state a cognizable federal claim, the Court could impose filing restrictions. [Doc. 5 in No. CIV 10-1161, at 12.] The Court further noted that "[p]ro se petitioners have a greater capacity than most to disrupt the fair allocation of judicial resources because they are not subject to the financial considerations–filing fees and attorney's fees– that deter other litigants from filing frivolous petitions . . . ." Id., at 12-13 (citing In re Sindram, 498 U.S. 177, 179-80 (1991)).

In the present case, notwithstanding the fact that Ballard's case proceeded to summary judgment, Ballard undoubtably disrupted the fair allocation of judicial resources.  For example, this case has been ongoing for 2½ years, and there have been over 200 filings.  Of these 200+ pleadings

and motions, Ballard filed at least 18 motions that had to be resolved. [Docs. 11 (waive PACER fees), 26 (enlarge time), 28 (re-attempt service), 32 (service of process), 33 (to seal), 42 (to continue), 54 (reconsideration), 76 (reconsideration), 86 (enlarge time), 87 (for intervention of U.S.), 103 (2nd motion to waive PACER fees), 107 (motion to compel), 126 (for Rule 11 sanctions), 131 (supplemental brief), 151 (for default judgment, construed as motion to compel), 166 (extend time), 175 (extend time), 180 (file surreply), 184 (reconsideration.] With the exception of the motion to compel [Doc. 151], which the Court granted in part, 17 motions were denied.  Some were denied as moot, one was stricken, and others were denied on the merits.  Many motions required full briefing and court action.

In addition, Ballard filed a number of letters [Docs. 46, 53] and notices [Docs. 29, 30, 43] that were of little to no assistance.  For example, she filed four notices and four affidavits in support of her request for default judgment, that the Court construed as a motion to compel. [Docs 157-164.] Moreover, the parties conducted extensive written discovery in this case. [Docs. 52, 62, 64-67, 74-77, 111, 116, 121, 127-128, 133-135, 136-40.]  Notwithstanding such extensive discovery, Ballard did not support her claims with admissible evidence.

According to Defendants, Ballard's conduct in this case created significant delays and thwarted Defendants' discovery efforts.  For example, as of mid-April 2012, Defendants observed that Ballard failed to respond to the GEO Defendants' Requests for Production, failed to respond to any of the discovery propounded by Defendant Vega-Cowan, failed to provide initial disclosures within fourteen days of the "meet and confer" as ordered by the Court, failed to submit the joint status report within the deadline established by the Court, failed to appear for the initial scheduling conference as ordered by the Court, failed to provide medical documentation to support her request for a continuance as ordered by the Court, and failed to provide signed medical and mental health

authorizations and a complete listing of medical providers as ordered by the Court. [Doc. 78.]
Notwithstanding the serious violations of the rules and court orders, Magistrate Judge Schneider
denied Defendants' Rule 37 motion and request for dismissal of the case.  Judge Schneider entered
a text-only Order, stating the denial was for the reasons set out at a July 2012 hearing. [Doc. 100.]
However, there are no minutes from that hearing, and it is unknown why the Magistrate Judge
declined to sanction Ballard in some form.

      The Court again warns Ballard that if she continues to file frivolous lawsuits or lawsuits
containing unsupported claims, she risks filing restrictions.  In the event that Ballard continues filing
more frivolous motions and pleadings, the Court will issue an Order to Show Cause why filing
restrictions should not be imposed.  *See* Tripati v. Beaman, 878 F.2d 351, 353-354 (10th Cir. 1989)
(holding that a district court can place filing restrictions on a plaintiff, but that the plaintiff is
"entitled to notice and an opportunity to oppose the court's order before [restrictions are]
instituted.").

## Recommendation

      Accordingly, the undersigned Magistrate Judge recommends that Defendants' Amended
Joint Motion for Summary Judgment [Doc. 156] be granted, and that Ballard's Amended Complaint
against Defendants, and this entire matter, be dismissed with prejudice.

Lorenzo F. Garcia
United States Magistrate Judge